# EXHIBIT 3

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT A

RESTRICTED – ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| MYPORT, INC.,<br><br>   Plaintiff,<br><br> v.<br><br>SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>   Defendants. | Civil Action No. 2:22-CV-00114-JRG |

**REBUTTAL EXPERT REPORT OF JAE YOUNG BANG, Ph.D.
REGARDING U.S. PATENT NOS. 9,832,017; 10,237,067; and 10,721,066**

**RESTRICTED – ATTORNEYS' EYES ONLY**





https://www.youtube.com/watch?v=ezME4_xMMnk ("How a film camera superimposes the date on photos") (Last visited October 12, 2023).

610.   While the above examples of the Nikon F2 DATA and the Focal P620D are film cameras, digital cameras at the time of the invention were similarly capable of adding a date stamp to captured images, and would have been known to a POSA at the time of the invention.

185

RESTRICTED – ATTORNEYS' EYES ONLY

For example, the BenQ DC E820 digital camera, released in 2007, was capable of adding a date as shown, for example, in Section 3.7.10 on page 16 of the user manual below:

**BenQ DC E820 Digital Camera User Manual**

Copyright
Copyright 2007 by BenQ Corporation. All rights reserved. No part of this publication may be reproduced, transmitted, transcribed, stored in a retrieval system or translated into any language or computer language, in any form or by any means, electronic, mechanical, magnetic, optical, chemical, manual or otherwise, without the prior written permission of this company.

**3.7.10 Setting the date stamp**
The Date Stamp function can be used to add a date to your pictures as you take them.

https://esupportdownload.benq.com/esupport/Digital%20Camera/UserManual/Digital%20Camera_um_User%20Manual_20070521_113711_DC_E820_UM%20CD%20EN%20200515.pdf (Last visited October 12, 2023). In my opinion, the ability of a digital camera to add a date stamp to a captured image is another example of an "internal" image source. Thus, it is my opinion that a POSA at the time of the invention of the Asserted Patents would have known and understood the concept of a camera capturing an image from an "internal" image source.

611. Dr. Bederson further opines that "claims 15-17 are not limited to interfacing the claimed camera with external images sources and thus are not fully described by the patents. Because the full scope of what claims 13 and 15-17 of the patents claim is not described by the written description of the patents, these claims are invalid for lack of written description." (Bederson Report at Para 1850.) For the reasons explained above, I disagree with Dr. Bederson.

612. As explained above, based on the teachings of the specification that the "data capture device" (e.g., camera) is not limited to capturing information from an "external" source, coupled with the knowledge of a POSA regarding cameras capable of capturing images from "internal" image sources existed at the time of the invention, a POSA at the time of the invention

would have understood based on the disclosure of the Asserted Patents that the claimed camera was not limited to capturing images from "external" image sources.

613. Thus, it is my opinion that Claims 13 and 15-17 of the Asserted Patents are supported by sufficient written description and are not invalid.

## XLIII. SUBJECT MATTER ELIGIBILITY

614. I have reviewed Dr. Bederson's expert report regarding his opinion that the claims are directed to patent-ineligible subject matter. For the reasons discussed in more detail below, I disagree with his opinions.

615. In paragraphs 1702-1707, Dr. Bederson discusses statements made by MyPort in a Response to IPR proceedings. I disagree with many of his statements therein. I address certain ones here.

616. In paragraph 1703, Dr. Bederson asserts that MyPort described the problem to be solved by the Asserted Patents as simply a problem with organizing and categorizing data including video and images, and then cites to a statement made by Mr. Malone in deposition. I disagree with Dr. Bederson's over-generalization because, among other things, this characterization ignores the technological improvement actually recited by the Asserted Patents as described below.

617. To solve the technological problem specific to computers, and more specifically, to digital media devices, the Asserted Patents are directed to "a system for capturing, storing, indexing and retrieving data objects, which can include a capture device, a storage facility and an access point." ('017 patent at 8:61-64.) The claim elements described in the preceding sentence show that the Asserted Claims are directed to improving the usability and functionality of a capture device, and more importantly, constitute a technology-based solution improving the operation of mobile devices and therefore are not directed to an abstract idea.

618. In paragraph 1707, Dr. Bederson asserts, "[t]hat MyPort says that the second or 'media data converter' is the disclosed 'tag generator' which includes performing 'the tag generation' using 'a human operator.'" I disagree with the assertion that the media/second data converter in the Asserted Claims is operated by a human for the reasons I provided earlier in Section XI.B.2.

619. In paragraph 1709, Dr. Bederson opines that "most of the claims are directed to collecting data, recognizing data, and storing data" and the some are "directed to transmitting that data and storing it in a remote location." In doing so, I believe Dr. Bederson is overly generalizing the claims to fit an abstraction. Specifically, at least, Dr. Bederson ignores that image recognition or tag generation (as he discusses at paragraphs 1712-1713) would be "nearly impossible" to perform as a human given the sheer volume of data.

620. In paragraphs 1712-1717, Dr. Bederson describes different claims, but each discussion rests on the premise that the claims are directed to an abstract idea. He does not consider that the claims are directed to a technological improvement of a computing device.

621. In paragraphs 1718-1721, Dr. Bederson addresses, at least topically, MyPort's position regarding the claims as not being directed to an abstract idea. He acknowledges that the specifications discuss technological improvements to computing devices, but he asserts that the claims do not actually claim those improvement. I disagree, for the reasons stated above and below.

622. In paragraphs 1722-1836, Dr. Bederson provides his opinion on step two of the patentable subject matter analysis and concludes that the Asserted Claims lack an inventive concept and are routine, well-understood, and conventional. I disagree.

623. The Asserted Patents are inventive because of how the claimed combination of elements work together to solve the problem in at least the way that digital audio and image/video files are transmitted, indexed, stored, and retrieved while using less storage space (*see*, paragraph 591 above) to address problems in the existing technologies. For example, the specification describes the problem with the "ability to virtually unlimited number of media files," including the "impossibility to manually describe and index every media file in one's possession" and that as a result, many are not organized, or poorly done so on devices. ('017 patent at 2:21-38.)

624. In paragraphs 1722-1744, Dr. Bederson addresses the technological issues identified by the Asserted Patents and the improvement in computer functionality the Asserted Patents achieve for those problems. Dr. Bederson disagrees with MyPort's positions (as reflected in interrogatory responses quoted by Dr. Bederson). I disagree with Dr. Bederson for the reasons stated above and below.

625. In paragraphs 1722, Dr. Bederson asserts, "… the claims are not even limited to a system in which the tagging of images was done automatically, '017 Patent, 5:51-58, and it could be done by a 'human operator' as indicated by MyPort's correlation of the 'media data converter' and 'second data converter' to the disclosed 'tag generator.'" I disagree for the reasons I provided earlier in Section XI.B.2.

626. Next, in paragraphs 1745-1747, Dr. Bederson presents a discussion and a chart that purports to go limitation by limitation to describe what he alleges are all "conventional" or generic structures. I disagree that at least the first data converter, combiner, and media/second data converter are generic structures or otherwise well understood, conventional, or routine. I also note that in overly simplifying the claims down to three or four words for each limitation,

189

Dr. Bederson appears to be ignoring the remainder of the claim limitation's language that describes what is being done.

627. In paragraphs 1759-1762, Dr. Bederson provides a discussion of the first data converter. Specifically, while pointing to a first data convertor discussion in the specification, he ignores that the first data convertor can process the data in accordance with the remaining limitations of the claims. For example, the first data converter captures the external audio information and processes and stores the captured external audio information in a digital audio format for the combiner to generate an association and for the media/second data converter to convert to a text context tag. Thus, I disagree with Dr. Bederson that the claimed first data converter is well understood, conventional, or routine.

628. Furthermore, Dr. Bederson appears to ignore that a POSA would understand the first data converter is a secondary data converter, which the Asserted Patents explain is "capable of capturing some phenomenon into a secondary data set, related to but separate from the information captured by the primary data converter." ('017 patent at 9:4-7.) The Asserted Patents further explain, "… at the time of information capture, the capture device may gather additional information from the operator by means of a secondary data converter 108 that relates to defining the context of the data element." ('017 patent at 4:24-27.) For the discussion of why a POSA would understand the first data converter is a secondary data converter, I refer to Section XI.A.2.c. Thus, I disagree with Dr. Bederson that the first data converter of the Asserted Claims is generic in that it is used in a well understood, conventional, or routine manner.

629. It is important to repeat that the audio information that the first data converter (i.e., a secondary data converter) captures is relevant throughout the remainder of the Asserted Claims. The first data converter stores the same audio information as digital audio in internal

storage. The combiner generates an association between the stored digital audio with the stored digital image. The media/second data converter, using the stored digital audio, performs conversion to a text context tag. The internal storage stores the text context tag, which is converted from the stored digital audio, associated with the digital image.

630. In paragraphs 1791-1803, Dr. Bederson provides a discussion regarding the combiner. He points to certain disclosures from Walker, Rothschild, Inoue, Fong, and Fuller references, each for incremental descriptions of what he alleges the combiner does in a "well understood, conventional, or routine" way. I disagree. Dr. Bederson does not provide any reference that, alone, describes a combiner that generates an association between the stored digital audio (captured by the first data converter) and the stored digital image (captured by the camera), where the digital audio is the same audio that the media/second data converter uses for the conversion to a text context tag. For additional discussion, I refer to Sections XI.A.2.c and XI.B.1.

631. In paragraphs 1804-1832, Dr. Bederson provides a discussion regarding the media/second data converter limitations. He points to numerous references in an effort to describe the media/second data converter claimed by the patents. However, Dr. Bederson ignores that the received set of captured information the media/second data converter converts is the information captured by the camera (i.e., a primary data converter) and the first data converter (i.e., a secondary data converter) and stored as the digital image and audio, respectively, where the combiner generates an association between the digital image and audio. For example, the media/second data converter must "know," from the received set of captured information, what the stored digital audio captured by the first data converter (i.e., a secondary data converter) is to convert it to a text based searchable file as a text context tag. Also, Dr. Bederson argues that the

==media/second data converter in the Asserted Claims, "can be a 'tag generator in which the tag generation is performed by a human operator,'" (¶¶ 1804) and "… merely seeks to automate a process that was conventionally performed by users manually or by automatically determining the content of images and audio using image recognition and speech-to-text conversion," citing a malformed sentence in the specification of the '017 patent. (¶¶ 1834). I disagree for the reasons I provided earlier in Section XI.B.2. Dr. Bederson does not provide any reference that, alone, describes the media/second data converter as discussed above.==

632.    Further, while Dr. Bederson discusses each limitation individually, opining that each is allegedly well-understood, routine, or conventional, he fails to analyze whether the ordered combination of the limitations may nonetheless be patent-eligible under step two.

633.    Regarding Dr. Bederson's opinions on invalidity, there is not a single opinion that a single reference discloses the first data converter, the combiner, and the media/second data converter. Instead, Dr. Bederson relies on combinations of prior art to form his opinion. But it is the combination of these limitations that clearly show that the claims are directed to patent-eligible subject matter. The improvement and incorporation of computer hardware, a capture device to capture image and audio information using primary and secondary data converters, create associations, convert/creating context tags, and store that information in association, in its ordered combinations, are not well known, understood, or conventional but rather substantially more so, and inventive.

\*\*\*

**RESTRICTED – ATTORNEYS' EYES ONLY**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 13th day of October, 2023 in Los Angeles, CA.

_____

Jae Young Bang, Ph.D.